147 U.S. 72
 13 S.Ct. 211
 37 L.Ed. 84
 ALEXANDRE et al.
v.
MACHAN et al.
 No. 61.
 January 3, 1893.
 
 Statement by Mr. Justice BROWN.
 This was a libel by the owners of the British barque Helen against the American steamship City of New York for a collision, which occurred on the evening of June 28, 1879, off the New Jersey coast between Barnegat and Absecon, and resulted in the sinking of the Helen, and the total loss of the vessel and cargo. The district court found both vessels to have been in fault, and decreed an apportionment of damages. 15 Fed. Rep. 624. Both parties appealed to the circuit court, by which the decree of the district court was reversed, the City of New York found to have been solely in fault, and a final decree entered for the libelants for $60,223.12, including costs. 35 Fed. Rep. 604. From this decree the owners of the steamship appealed to this court. The following facts and conclusions of law were found by the circuit court:
 '(1) The British barque Helen, an iron vessel of 282 tons register, while on a voyage from Havana to New York city, loaded with sugar, was sunk by collision with the steamship City of New York, June 28, 1879, about 10:50 P. M. The captain and three of the seamen of the barque were drowned when the vessel sank.
 '(2) The collision took place at a point off the coast of New Jersey, 6 1/4 miles from shore, in 10 fathoms of water, 12 1/2 miles from Barnegat lighthouse, and 9 1/2 miles from Tucker's Beach lighthouse.
 'The City of New York was a wooden steamship, 242 feet long and 1,715 tons register, having a left-handed propeller, and was bound on a voyage from New York to Havana. Her full speed was about 12 knots an hour, and when going at full speed her headway could not be stopped by reversing her engines within a distance of an eighth of a mile.
 '(3) On the night in question the wind was blowing strong from the southwest or the south southwest. About half an hour preceding the collision the night became foggy; so much so that vessels could not discover one another at a distance of one-eighth of a mile. During this time, and until within about three or four minutes before the collision, the vessels had been approaching each other, the course of the steamer being about S. by W. 1/2 W., and the course of the barque being about N. E. The steamship was going about 11 knots an hour, which was all the speed she could make against the wind. The barque was going about 4 knots an hour, and each vessel kept her respective course until she heard the fog signal of the other.
 '(4) During the half hour preceding the collision three seamen were on the deck of the barque besides the mate, one seaman being at the wheel and two on the lookout forward, alternately blowing the fog horn, and the barque's lights were properly set and burning. During the same time the navigation of the steamer was in charge of her second mate, her quartermaster was at the wheel, her engine was in charge of a competent engineer, she had a lookout on the forward deck, and her regulation lights were properly set and burning. The lookout on each vessel was vigilant. Each vessel observed the proper fog signals. The steamer maintained her full speed against the wind until her engines were reversed, just before she struck the barque.
 '(5) Before either vessel discovered the other those in charge of each heard the fog signals of the other. At about two minutes prior to the collision those in charge of the steamer first heard the fog horn of the barque, and from the apparent direction of the sound thought she was one point off the steamer's starboard bow. Immediately upon hearing the fog horn the mate ordered the wheel of the steamer put to starboard and hard astarboard. The order was promptly executed, and the steamer proceeded on under full speed until those in charge discovered the sails of the barque. The steamer had run under hard astarboard helm at least a minute before the barque was seen. Those in charge of the steamer then discovered that the barque's course was eastward, across the steamer's bow. The steamer then sounded successive whistles of alarm, and those in charge saw the barque luffing to the starboard. Thereupon the mate immediately ordered the steamer's engines reversed and her wheel ported, and this order was promptly executed, but she was then close to the barque, probably not to exceed 150 feet, and her headway could not be stopped in time to avoid a collision, and the steamer struck the barque on the barque's port side, her stem striking just forward of the barque's mizzen rigging, with such force that she penetrated the barque a distance of five feet, and the barque sank almost instantly.
 'The whistle of the steamer first heard by those in charge of the barque indicated to them that the vessels were quite near to each other. They thought the steamer was approaching bearing abeam on the barque's port side. Immediately after they saw her masthead light and then her green light, whereupon the mate told the wheelsman to port the wheel, and called to those below to save themselves. The man at the wheel had hardly got the wheel over when the steamer struck the barque. During the time the steamer was running under her hard astarboard wheel she changed her course to the eastward three or four points, and the barque, after she luffed, changed her course one or two points by the time the vessels came together.'
 The sixth finding relates only to the damages, and is immaterial.
 'Conclusions of law: (1) The steamer was guilty of fault in violating the twenty-first rule, because she did not slacken her speed when she heard the fog signals of the barque, and also because she did not go at a moderate speed when in a fog, and also because she changed her course and kept on at great speed after she heard the barque's fog horn before seeing her. (2) The barque's change of course was an error in extremis.'
 R. D. Benedict, for appellants.
 G. A. Black, for appellees.
 Mr. Justice BROWN, after stating the facts in the foregoing language, delivered the opinion of the court.
 
 
 1
 Notwithstanding the ruling of this court in The Abbotsford, 98 U. S. 440, that the finding of facts by the circuit court is conclusive, and that the only rulings that can be reviewed by this court are those made upon questions of law, but few collision cases have been brought to this court since the act of February 16, 1875, (18 St. p. 315,) took effect, in which an effort has not been made, under one guise or another, to obtain a review of the findings of the circuit judge upon the testimony. If it were the duty of the court to review the testimony upon every finding of fact to which the defeated party chose to take an exception, and inquire whether such testimony authorized the finding, the title of the act 'To facilitate the disposition of cases' was a misnomer, and the act itself might better never have been passed. In this case 16 exceptions were taken to the findings of the court; 21 specifications of error are embodied in the seventeenth exception to the opinion of the court, which was incorporated in the bill of exceptions; and there are also 35 exceptions to the refusal of the court to find the facts and law as requested by the claimants.
 
 
 2
 In construing the act of 1875 the following propositions may be regarded as settled:
 
 
 3
 (1) That the facts found by the court below are conclusive; that the bill of exceptions cannot be used to bring up the evidence for a review of these findings; that the only rulings upon which we are authorized to pass are such as might be presented by a bill of exceptions prepared as in actions at law; and that the findings have practically the same effect as the special verdict of a jury. The Abbotsford, 98 U. S. 440; The Clara, 102 U. S. 200; The Benefactor, Id. 214; The Annie Lindsley, 104 U. S. 185; Collins v. Riley, Id. 322; Sun Mut. Ins. Co. v. Ocean Ins. Co., 107 U. S. 485, 1 Sup. Ct. Rep. 582; Watts v. Camors, 115 U. S. 353, 6 Sup. Ct. Rep. 91; The Maggie J. Smith, 123 U. S. 349, 8 Sup. Ct. Rep. 159; The Gazelle, 128 U. S. 474, 9 Sup. Ct. Rep. 139.
 
 
 4
 (2) That it is only the ultimate facts which the court is bound to find; and that this court will not take notice of a refusal to find the mere incidental facts, which only amount to evidence from which the ultimate fact is to be obtained. The Francis Wright, 105 U. S. 381; Insurance Co. v. Allen, 121 U. S. 67, 71, 7 Sup. Ct. Rep. 821; The John H. Pearson, 121 U. S. 469, 7 Sup. Ct. Rep. 1008.
 
 
 5
 (3) If the court below neglects or refuses to make a finding one way or the other as to the existence of a material fact, which has been established by uncontradicted evidence, or if it finds such a fact when not supported by any evidence whatever, and an exception be taken, the question may be brought up for review in that particular. In the one case the refusal to find would be equivalent to finding that the fact was immaterial; and, in the other, that there was some evidence to prove what is found, when in truth there was none. Both of these are questions of law, and proper subjects for review in an appellate court. The Francis Wright, 105 U. S. 381, 387; The E. A. Packer, 140 U. S. 360, 11 Sup. Ct. Rep. 794.
 
 
 6
 In the case of The Francis Wright the court held that the bill of exceptions ought to show the grounds relied on to sustain the objections, so that it might appear that the court below was properly informed as to the point to be decided, and that the facts sought to be incorporated were conclusively proven by uncontradicted evidence; and, if the exception were as to facts found, it should be stated that it was because there was no evidence to support them, and then so much of the testimony as was necessary to establish this ground of complaint, which might under some circumstances include the whole, should be incorporated in the bill of exceptions. In The E. A. Packer, 140 U. S. 360, 11 Sup. Ct. Rep. 794, the circuit court refused to find a specific fact which this court thought to be material, and to have been proven by uncontradicted testimony, and the case was remanded for a further finding in regard to this point.
 
 
 7
 This case, then, must turn upon the question whether the circuit court found any facts which were wholly unsupported by testimony, or refused to find any fact material to the issue, when such fact was proven by uncontradicted evidence.
 
 
 8
 The undisputed facts are that the night was foggy, and that the barque was bound from Havana to New York upon a northerly and easterly course, and was sailing free under a strong southerly wind. The steamship was bound from New York to Havana upon a course S. by W. 1/2 W., and was proceeding at her usual full speed, which was from 10 to 11 knots an hour. Each was making the fog signals required by law, which were heard upon each vessel before the other vessel came in sight. About two minutes prior to the collision the officers in charge of the steamer first heard the fog horn of the barque, and, from the apparent direction of the sound, thought she was one point off the steamer's starboard bow. Immediately upon hearing the fog horn the mate ordered the wheel of the steamer to starboard and hard astarboard. The order was promptly executed, and after the steamer had run at full speed under her hard astarboard helm about a minute, the sails of the barque were discovered crossing the steamer's bows to the eastward. The steamer immediately blew several alarm whistles, and the officer of the deck saw the barque luffing to starboard. The steamer's engines were thereupon immediately reversed, and her wheel ported; but, being then close to the barque, her headway could not be stopped in time to avoid a collision, and she struck the barque upon her port side between the main and mizzen rigging, with such force that she penetrated the barque a distance of five feet, and sank her almost immediately. The captain and three of the crew were drowned.
 
 
 9
 1. Appellants' first exception is to the third finding of fact, that 'the wind was blowing from the southwest or the south southwest,' because it does not find the direction in which the wind was blowing, and because the direction of the wind was neither S. W. nor S. S. W., but S. There was some conflict of testimony upon this point between the crews of the respective vessels and the observers at the signal stations and lighthouses between Sandy Hook and Cape May; but, as the district judge was also of the opinion that the wind was somewhere from S. W. to S. S. W., it is impossible for us to say that there was no testimony to support this finding. If it were impossible to ascertain definitely from the testimony whether it was from the S. W. or S. S. W., there was clearly no obligation to find the exact point from which it was blowing. As observed by the district judge, this finding 'confirms the previous conclusion that the barque, up to the time of the collision, had been sailing on a northeast course, since that would bring such a wind about a point on her starboard quarter, as all her witnesses testify.'
 
 
 10
 2. The finding that the vessels could not discover one another at a distance of one-eighth of a mile is substantially confirmed by all the testimony and by the opinion of the district judge, who makes a similar statement three or four times in his opinion.
 
 
 11
 3. Appellants also except to the finding that the course of the barque was 'about N. E.,' instead of about N. E. by N. 1/2 N.; but as the vessel had a free wind, and the usual course at this point between Absecon and Barnegat on the New Jersey coast, where the collision occurred, was N. E. or N. E. by N. for vessels bound to New York from Cape Henlopen, a departure from that course will not be presumed, in the absence of some controlling reason. Indeed, the probability that a steamer or a vessel sailing with a free wind will pursue the course customarily pursued in that vicinity, by vessels bound from and to the same port, is so strong that a deviation from that course without apparent cause will not be considered as established without a clear preponderance of testimony. The district judge also found that the general course of the vessel was N. E. until her wheel was put to port, just before the collision. Exception was also taken to the finding that 'the steamship was going about eleven knots an hour.' As the appellants claim in their brief she was making 11 knots an hour, and both courts agree in this opinion, it is difficult to see why an exception was taken to this finding.
 
 
 12
 4. The fourth, fifth, and seventh exceptions are dependent upon the construction to be given to the several findings made by the court, and are not to the findings themselves, and hence are impertinent. The sixth exception is unimportant.
 
 
 13
 5. The remaining 10 exceptions to the findings of fact are taken to the several clauses of the last paragraph of the fifth finding. There were also 21 specifications of objections to the opinion of the circuit court, embodied in a single exception—the seventeenth; and 35 exceptions to the refusal of the court to find the facts and conclusions of law as requested by the claimants. But the substance of all these objections to the findings and opinion of the circuit court turn upon those contained in the paragraph above cited, which indicate that the change of course made by the barque just prior to the collision was an error in extremis, for which the barque was not responsible. This was the point upon which the circuit and district courts chiefly differed, and upon which the stress of the case was laid. The finding in question was as follows: 'The whistle of the steamer first heard by those in charge of the barque indicated to them that the vessels were quite near to each other. They thought the steamer was approaching bearing abeam on the barque's port side. Immediately after, they saw her masthead light and then her green light, whereupon the mate told the wheelsman to port the wheel, and called to those below to save themselves. The man at the wheel had hardly got the wheel over when the steamer struck the barque. During the time the steamer was running under her hard astarboard wheel she changed her course to the eastward three or four points, and the barque, after she luffed, changed her course one or two points by the time the vessels came together.'
 
 
 14
 In this connection the allegation of the original libel was that 'the wind at the time was W. S. W., and the said barque was heading E. by N. 1/2 N., running free, and going at the rate of about three knots an hour. * * * That when the said steamer was close upon the said barque, and the impending collision inevitable, and in the effort to escape the same, order was given to port the barque's helm, which order was obeyed, but did not alter the course of said barque more than a point, and in a direction away from the said approaching steamer.' The answer denied 'that such order was given when the collision was inevitable, or that it did not alter the course of the barque more than a point, or that such alteration was in a direction away from the approaching steamer;' and averred 'that at about 10 o'clock and 50 minutes the second mate in the pilot house heard the blast of a fog horn about a point or so on the starboard bow of the steamer, whereupon he ordered the wheel of said steamer to be put hard astarboard, which order was obeyed, and was the proper order, and would have been efficient for the avoiding of the collision but for the change of course on the part of the barque, hereafter spoken of. * * * That when, or almost immediately after, the helm of the said steamer was starboarded, the helm of said barque was ported, and her head began to come up towards the course of the said steamship; that said change of course of said barque was at once seen and reported by the lookout on the steamer, and seen by her second mate in the pilot house, and that as soon as such change was seen, and when the head of the steamer had been changed about a point under her starboard helm, her helm was put hard aport, and her engine was stopped and reversed. * * * And these respondents allege that the said barque changed her course under her port wheel four or five points before the collision, and that at the time of the collision she was heading about east and said steamer was heading about S. or S. by W., and that such change of course on the part of the barque carried her across the bow of the said steamship, which had taken the proper measures to avoid her, and but for the said change of course on the part of said barque would have succeeded in doing so.'
 
 
 15
 The case was tried upon these allegations, and the district judge found that all the witnesses agreed that, at the time of the collision, the barque 'was heading about E. or E. by N., or about four points to the eastward of the usual course for vessels bound for New York;' that the testimony of the mate and wheelsman of the barque, who were the officers of the deck, that her course prior to the collision was E. by N. 1/2 N., was untrue and wholly irreconcilable with the admitted facts, and with the other accredited testimony; and, inferentially, at least, that their testimony was fabricated for the purpose of demonstrating that the change of course from E. by N. 1/2 N. to E. or E. by N. (from half a point to a point and a half) was so slight that it must have been made in extremis, while, if the course of the barque had been N. E., the change would have been from three to four points. The district court found the course to have been N. E.; that this course was continued until the helm was ported; and that the 'change of three to four points was to great, and was commenced too early and too far off from the steamer to be regarded as a change in extremis, and, as this change of course evidently contributed to the collision the barque must also be held chargeable with fault.' A decree was thereupon rendered apportioning the damages, and both parties appealed to the circuit court.
 
 
 16
 Pending that appeal, the libel was amended by averring that 'the wind at the time appeared to be by said barque's compasses W. S. W., and the said barque was heading, as it appeared by said compasses, E. by N. 1/2 N., running free, and going at the rate of about three knots an hour. * * * That the said barque was an iron vessel, and had a list to starboard, and her compasses were affected by those facts, and she had a deviation card on board, by means of which corrections in the readings of said compasses were made, which said deviation card was lost with said vessel, and, the master being drowned, libelants were unable to more accurately state the said deviation than that it was between one and three points on different courses.'
 
 
 17
 Exceptions were filed to this libel for indefiniteness and insufficiency, and a second amended libel was filed, averring 'that the wind at the time appeared to be, by said barque's compasses, W. S. W. Libelants believe that the true direction of the wind was S. W.; that the compasses of the barque indicated it to be W. S. W. for the reasons hereinafter stated. The said barque was heading, as it appeared by said compasses, E. by N. 1/2 N., and libelants believe her true heading was N. E. 1/2 E., and that the said heading appeared to be E. by N. 1/2 N., by said barque's compasses, for the reasons hereinafter stated.' The previous allegation with regard to deviation was repeated with the addition that 'libelants believe that such deviation on a true N. E. 1/2 E. course was two points, so that the course appeared by said barque's compasses to be E. by N. 1/2 N.' To this amended libel an answer was filed, and the case went to trial in the circuit court. The circuit court was of opinion that if the barque changed her course four or five points to the starboard, as claimed by the steamship, such change could not have been made when the vessels were within two or three hundred feet of each other; that, if it could be demonstrated that, at the time of the collision, the barque was headed about east, and that her course previous to the change was N. E., the argument for the steamer would be convincing; but that this could not be demonstrated unless the testimony of the wheelsman of the steamer, who gave the course on which the steamer was headed when the barque's change of course took place, and also when the collision took place, was accepted as correct. 'It is highly improbable,' said the court, 'that in the excitement and confusion of the moment the helmsman of the steamer looked at his compass so carefully as to accurately note the steamer's course when he was ordered to put his wheel hard aport, and again when the collision took place. Equally improbable is his testimony that while the steamer was under a hard astarboard helm her course was only changed about three quarters of a point, although she was running at full speed for a minute under that helm, and, that while she was under her helm hard aport at the time she was reversing her engines, her course was changed a point and three quarters to starboard.'
 
 
 18
 The court conceded that the mate of the barque, who was the only witness who attempted to give her course by the compass, was not entitled to any credit, but that the testimony of the wheelsman, the lookout, and the engineer of the steamer so strongly confirmed by the testimony of the witnesses for the barque, to the effect that her change of course was not made until the vessels were so close together that a collision was unavoidable, that it was not necessary to devote any time to the attempt to ascertain what the course of the barque was previously to the time this change was made. 'All the witnesses for the steamer agree that the barque's change of course took place under their observation, and that the steamer sounded an alarm of successive blasts of her steam whistle and reversed her engines.' The court evidently was not satisfied with the testimony that the barque was headed east, or nearly so, at the moment of impact, and gave weight to the testimony of a diver who visited the wreck a few days after the collision, and testified that she was lying at the bottom of the ocean headed about N. N. E. on a line parallel with the shore. It thought this testimony more persuasive in fixing her heading approximately than the conjectural opinions of witnesses formed in the excitement and confusion of the moment, who thought she was headed about east. In short, it came to the conclusion that the change of course which brought the two vessels together was made by the steamer, while running a minute under her hard astarboard helm, rather than by the barque, and that, upon this assumption, if the course of the barque were changed only one or two points, the vessels would have come together at the angle shown in the diagrams of the witnesses upon both sides. It was evidently of the opinion that the testimony that the barque was headed east, or nearly so, at the moment of collision, indicating, as it did, a change of course of three or four points, was outweighed by the testimony of the witnesses that, whatever change of course was made, took place when the vessels were in plain sight of each other, and so close together that a collision was unavoidable.
 
 
 19
 Upon the findings of the circuit court there can be no question of the gross negligence of the steamship. She was not only not running at the moderate speed required by rule 21, but she failed to take the proper precautions when the proximity of the sailing vessel became known to her. Upon hearing the fog horn of the barque only one point on her starboard bow, the officer in charge should at once have checked her speed, and, if the sound indicated that the approaching vessel was near, should have stopped or reversed until the sound was definitely located, or the vessels came in sight of each other. Indeed, upon the testimony in this case, it is open to doubt whether, if the engine had been at once stopped, the steamer would have come to a standstill before she had crossed the course of the barque. There is no such certainty of the exact position of a horn blown in a fog as will justify a steamer in speculating upon the probability of avoiding it by a change of the helm, without taking the additional precaution of stopping until its location is definitely ascertained. The Hypodame, 6 Wall. 216; The Kirby Hall, 8 Prob. Div. 71; The Sea Gull, 23 Wall. 165, 177; The Ceto, 6 Asp. 479, 14 App. Cas. 670.
 
 
 20
 So far as the case of the barque is concerned, there was evidently testimony to support the findings of the circuit court, and if these findings are consistent, and justify its conclusion of law that the barque's change of course was an error in extremis, we cannot do otherwise than affirm the decree. In view of the recklessness with which the steamer was navigated that evening, it is no more than just that the evidence of contributory negligence on the part of the sailing vessel should be clear and convincing. Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor. Taking the finding of the circuit court, that the course of the barque was about N. E., in connection with the fact that after she luffed she changed her course but one or two points by the time the vessels came together, it is evident that that court did not agree with the district court that she was headed E. or E. by N. at the time of the sollision. Nor is this finding inconsistent with his further finding that when the barque was first seen the officers of the steamer discovered that her course was eastward, since that may be construed as any point east of north. The evident gist of the steamer's complaint is the refusal of the circuit court to find the heading of the barque at the moment of collision. Had it found such course to be E. or E. by N., as the answer averred, and as much of the testimony indicated, it would necessarily follow that she must have changed her course from three to four points under her hard aport helm,—a change scarcely consistent with an error in extremis. But the testimony upon this point was that of the mate and the wheelsman of the barque, and is a mere inference from their thoroughly discredited testimony that the course of the barque was E. by N. 1/2 N., and that she swung only a point to starboard. Having once found that this was not the course of the barque, and that such course was N. E., this testimony falls to the ground. The testimony of the mate and wheelsman of the steamer, that the barque was heading E. by N. or E. by N. 1/2 N. at the moment of collision, was evidently nothing but a mere guess. Indeed, it is very improbable that, in the excitement and consternation occasioned by the immediate presence of such a peril, the wheelsman of either vessel would stop to look at the compass or notice the bearing, even of his own vessel, much less that of the other. While the testimony of the diver, that her heading after she sunk was N. N. E., may not have been entitled to great weight, it was a circumstance tending to support the theory that she was not heading E. by N. It is evident that if her general course were N. E., and her helm were put hard aport, as all agree it was, she could not have been heading N. N. E. at the time of the collision. It is evident that the circuit court was dissatisfied with all the testimony upon the subject of the barque's heading at the time of the collision, and rested its conclusion upon the finding that, during the time the steamer was running under her hard astarboard wheel, she changed her course to the eastward two or three points, and the barque, after she luffed, changed her course but one or two points by the time the vessels came together. Taken in connection with the further finding that the mate told the wheelsman to port the wheel after he saw the masthead light and the green light of the steamer, it justified the conclusion that this order was given in extremis.
 
 
 21
 The court evidently thought that more satisfactory evidence of the heading of the two vessels at the time of the collision was derived from the fact that the steamer, while running at 11 miles an hour, put her helm hard astarboard from one to two minutes prior to the collision. At this rate of speed it is by no means improbable that she swung three or four points before the collision took place, while the other testimony left it at least doubtful whether the barque swung more than one. This inference is strengthened by the fact that the steamer's screw was left-handed, and that a reversal of the engine would have a tendency to throw her head still more rapidly to port. Evidently the order to port the steamer was given when the vessels were so near together that it could have had but slight effect upon her course.
 
 
 22
 Upon the whole, it is impossible for us to say that these findings, while inconsistent with the theory of both parties, were not supported by the testimony, or that they did not justify the conclusion that the change of course of the barque was made in extremis. The decree of the court below is therefore affirmed.