## THE J. P. McALLISTER.
## THE AEOLUS.

### LEHIGH VALLEY R. CO. v. McALLISTER LIGHTERAGE LINE, Inc., et al.

### McALLISTER LIGHTERAGE LINE, Inc., v. UNITED STATES.

### No. 136.

Circuit Court of Appeals, Second Circuit. April 11, 1932.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Paul Tyson, both of New York City, of counsel), for appellant McAllister Lighterage Line, Inc.

George Z. Medalie, U. S. Atty., of New York City (A. M. Menkel, Sp. Asst. to U. S. Atty., of Brooklyn, N. Y., of counsel), for the United States.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson and Willard M. L. Robinson, both of New York City, of counsel), for appellee Lehigh Valley R. Co.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The tug J. P. McAllister, belonging to McAllister Lighterage Line, brought the barge McAllister No. 85 of the same line, loaded with steel billets, alongside the starboard side of the steamship Aeolus, owned by the United States, for the purpose of having the cargo transferred to the steamship. The Aeolus lay on the north side of Pier 15, Hoboken, with her bow inshore and her stern extending to about the end of the pier. The Aeolus was to have a dock trial of her propeller before going to sea and her master gave orders not to take on the steel billets, apparently because taking cargo aboard would delay the dock trial.

The tug McAllister had left the barge alongside the Aeolus, when her master was notified by those in charge of the Aeolus to shift the barge to the south side of Pier 15. She accordingly proceeded to return to the barge in order to remove her from the slip. As she started toward the barge she noticed that the starboard propeller of the steamship was in motion and her master requested that the engines be stopped. The bargee also requested that the engines be stopped.

In accordance with these requests the officer Wiebe sent a messenger to the engine-room to stop the engines. They were stopped, the lines from the barge to the ship were cast off, the tug ran a line from her bow to the bow bitt of the barge, and began to back her out of the slip.

When the tug had got the barge halfway out, the starboard propeller of the Aeolus suddenly began to turn over and the suction carried the barge in and upon the revolving propeller so that her starboard side was holed and she careened and dumped her cargo.

The Lehigh Valley Railroad, as bailee of the cargo of steel billets, filed the libel in the first of the above suits to recover damages from the tug McAllister and the latter brought in the Aeolus under the 56th Rule in Admiralty (28 USCA § 723). In the second suit the McAllister Lighterage Company, as owner of the barge, filed the libel against the Aeolus to recover damages for injuries to the barge, and the Aeolus brought in the tug McAllister under the 56th Rule.

By a special Act of Congress, the Aeolus, though a government vessel operated by the Navy Department, may be sued, as though owned by a private individual. The trial court divided the damages in each suit upon the theory that both the tug and the Aeolus were negligent and equally responsible.

The United States, as owner of the Aeolus, appeals and insists that the tug McAllister was alone responsible for the accident and should be held solely liable; and McAllister Lighterage Line, as owner of the tug McAllister, likewise appeals and contends that the Aeolus should be held solely liable. We agree with the latter contention.

The District Court filed an opinion in which the judge said:

"In order to place responsibility upon the Aeolus it is necessary to find that the starboard propeller was twice placed in operation; first, just prior to the tug's entry to the slip to remove the barge, and second, after the lines of the barge were cast off and the tug had started to pull the barge away. Such finding can, I think, be made, but it depends solely upon the evidence offered by the claimant for the tug.

"The testimony upon behalf of the Aeolus, so far as what actually took place with regard to the starting and stopping of the pro-

986

peller, is so confused and contradictory as to be unreliable."

 The testimony of the witnesses for the Aeolus, who narrated the accident, was, except that of the engineer, Dwyer, taken by deposition, while the testimony of the witnesses for the McAllister Lighterage Line was taken in open court. The latter testimony carried conviction to the trial judge. The main difference between the two lines of evidence was that the former was either expressly or in arguendo to the effect that the engines were stopped but once, and only after the barge had come into contact with the revolving propeller. A finding in accordance with contentions of the Aeolus would disregard the views of the trial judge as to the credibility of the witnesses for the McAllister Line, whom he saw and believed. He said: "I have concluded * * * to rely very largely upon the testimony of the barge captain, who, as I noted at the trial was an intelligent and apparently unbiased witness." Moreover, the contention of the Aeolus that the tug started to remove the barge, while the propeller was turning, is inconsistent with the probabilities of the situation and is even contrary to the inferences naturally to be drawn from the testimony of some of her own witnesses.

Lieutenant Wiebe, the officer of the deck on the Aeolus, testified that he was requested to order the engines stopped, by some one on the ship in civilian clothes, who had to do with loading the Aeolus; that he acceded to the request and immediately sent a messenger to the engine-room with directions to have the engines stopped and another messenger to notify the executive officer. He said that the first messenger reported that the order was given. Shortly after this report, Wiebe heard the knock of the barge on the propeller. (Fol. 741.)

Austin, the executive officer of the Aeolus, admitted that the messenger came to him and requested permission to stop the engines and that he sent him down to stop them. The chief engineer, Ingram, swore that both of the messengers came to him with orders to stop the engines and that the orders were promptly fulfilled. Thus it appears that the engines were stopped after the dock trial had once begun. It is evident, therefore, that the tug must have started to take out the barge when the propeller was turning, if we are to believe the witnesses for the Aeolus. This supposition involves such extreme negligence on the part of the tug as to be highly improbable. We cannot understand why the request to

stop the engines was ever given, if the tugmaster and the bargee did not anticipate the evident danger of towing a barge close to a revolving propeller. If they did realize it, it is difficult to suppose that the tugmaster would begin the maneuver until he was satisfied that the propeller was at rest. The story of the tugmaster and the bargee that the propeller had ceased revolving and was started again before the barge had got out of the slip is a much more reasonable way of accounting for the accident than the theory of the Aeolus that the maneuver was executed in the face of a moving propeller.

The story of the bargee and the tugmaster is confirmed by the circumstance that the quartermaster, Bryan, was "masted" for starting the engines without any orders from his superior officer. While it is theoretically consistent with the claim of the Aeolus that they were only started once and that Bryan started them in the beginning, the fact that he was "masted" for improper assumption of authority and afterwards sent to a hospital for examination as to his mental condition accords with the story of the witnesses for the tug that the engines were started twice; the first time upon a proper order, and the last time by the irrational and inexplicable act of the erratic Bryan. The conduct of the ship's officers was compatible only with an improper starting of the engines by someone. It only seems reasonable to suppose that the special concern and immediate drastic action of the officers, which the starting of the engines caused, was due to the fact that an unexpected turning of the propeller had resulted in serious damage.

It is further evident that the engines were started twice because Bryan said he had set the telegraph for "slow speed ahead," and Chief Engineer Ingram testified that they were started in the beginning by an order from the bridge given through the speaking tube. While he denied that any other order to start them was given, it is plain that the order which he says he got over the speaking tube was not the signal from Bryan given by telegraph. Bryan said that shortly after 1 p. m. he telegraphed to the engine-room "slow speed ahead" and that four or five minutes later he felt the vibration of the collision. The Engine Room Log, however, notes that Bryan was not put under sentry charge until 1:45 p. m. It is impossible fully to reconcile the whole story of Ingram with any reasonable theory about the various occurrences, but if he was right in saying that the order to start the engines was given over the speaking

tube and Bryan was right in his testimony that he gave a signal by telegraph, the testimony of these two witnesses in many respects supports that of the witnesses for the tug McAllister and the barge, who said that the engines were started twice. It is plain that the trial judge was justified in characterizing the testimony for the Aeolus as "so confusing and contrary as to be unreliable," and in saying that when "once a theory be evolved upon the testimony of one of the ship's witnesses, it is, upon reading the evidence of another, rendered altogether untenable." Although the trial judge found that the Aeolus was negligent in starting the engines after they had been stopped and while tLe tugmaster was attempting to remove the barge, he divided the damages because the tugmaster relied upon a statement that the propeller had stopped made by a longshoreman who was throwing the lines off the McAllister No. 85 in order to enable her to start, and did not put himself "into communication with the responsible officer on board the Aeolus." But it is apparent from testimony both of the tug's witnesses and those from the engine-room of the Aeolus that a notice was given to stop the engines and that they were in fact promptly stopped. In other words, responsible officers on board the Aeolus had stopped the engines under proper orders and some one started them without giving the tug an opportunity to remove the barge. Failure to keep the propeller from revolving until the barge was removed was plain negligence on the part of the Aeolus. The Nevada, 106 U. S. 154, 1 S. Ct. 234, 27 L. Ed. 149; Barrett v. LaSavoie (C. C. A.) 42 F.(2d) 422, affirmed 42 F.(2d) 424; The Dorothy (C. C. A.) 189 F. 40.

The trial court also found that the tug was in fault because she attempted to back out the barge on a single line attached to the middle bitts of the barge's bow and on a course that ran near to the propeller, instead of taking her alongside and removing her from the proximity of the propeller. There apparently was plenty of room in the slip to take her out without going near the stern of the Aeolus. But the tug had the barge on a short line and the maneuver was safe enough unless either the suction from a revolving screw or a strong ebb tide made the barge unmanageable. The finding that the tug was negligent was on the theory that the tide was ebb and that the barge might have struck the propeller even if it was not revolving and have suffered injuries thereby. Not only is the theory that the tug could not have handled the barge on a short line in an ebb tide where no suction from the propeller was involved quite speculative, but the tide tables indicate that the tide was flood, or at least slack.

The tide table produced upon the argument and annexed to the brief of the McAllister Lighterage Line, as Appendix A, shows that there was low water at Governors Island at 8:42 a. m. The injury to the barge occurred about 1:15 p. m., or four and a half hours thereafter. The current charts marked Appendix B and Appendix C indicate that the tide was probably flood at 1:15 p. m. at Pier 15, Hoboken. Proctors for the government contend that while the current may have run flood several feet below the surface of the river, it was not flood near the surface and, therefore, would not have kept the barge off the propeller even if the propeller had been motionless. The tide tables indicate a flood tide at the time in question and we cannot regard the testimony in support of an ebb tide as sufficient to sustain the burden which lay upon the Aeolus to establish the existence of a current that made it dangerous for the tug to back out her barge on a short line. Even if it can be said that there is doubt whether there was a flood tide at Pier 15, Hoboken, at 1:15 p. m., the table and charts we have referred to certainly show that an ebb tide could not have then been running. If we assume that the tide was then not flood, but slack, or even still slightly ebb, we cannot say that the tug could not have easily controlled the barge and kept her off the propeller had it remained motionless instead of beginning to revolve and to draw in the barge by suction. To say that bad seamanship of the tug contributed to the disaster is contrary to the proof or mere guesswork at best.

In view of the foregoing, the trial court was justified in finding that the Aeolus negligently started her starboard propeller when the tug was attempting to tow the barge from the slip and that the suction drew in the barge and damaged her and her cargo. Since the damage to barge and cargo was primarily due to gross acts of negligence on the part of the Aeolus, we need not speculate as to whether the possible influence of a slight ebb tide (had such a tide been running, as we do not believe to have been the case) might have been sufficient to deprive the tug of control and to carry the barge upon the propeller even though it had been motionless. The fault of the Aeolus is clear. A mere doubt about the management of the tug is insufficient to justify a division of damages. The Victory & The Plymothian, 168 U. S. 410, 18 S. Ct. 149,

42 L. Ed. 519; The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943; The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84.

The decree is modified so as to hold the Aeolus solely liable to each libelant and to dismiss the libel of the Lehigh Valley Railroad as against the tug J. P. McAllister in the first suit, and the petition of the United States bringing in the said tug in the second suit.