## THE VELMA BROOKS.
## THE MUNDOLPHIN.

Nos. 1867, 1868.

District Court, D. Maryland.
April 19, 1933.

George W. P. Whip (of Lord & Whip), of Baltimore, Md., for libelant.

Robert W. Williams (of Janney, Ober & Williams), of Baltimore, Md., for respondent.

### Opinion.

CHESNUT, District Judge.

In broad daylight, on a fine summer morning, with a calm sea and ample seaway, two vessels, one a steam freighter heavily laden with a cargo of sugar, and the other a much smaller power boat, collided in the Chesapeake Bay off the mouth of the Potomac river. The power boat promptly sank with her cargo of tin cans, all her crew being rescued by the freighter. The time was June 28, 1931, at 10:11 a. m.

In these circumstances it is highly probable that either the steamer or the power boat was seriously at fault; and possible, although less probable, both were at fault. That the power boat, whose owner, with the owner of the cargo, are libelants here, was at fault is admitted by their counsel. His contention, however, is that the steamer was also at fault and the damages should be divided in accordance with the usual admiralty rule in such matters. In my opinion the testimony requires the adoption substantially of respondent's story of the collision and the circumstances leading thereto. On one, and possibly two, important points there is an irreconcilable conflict of testimony between the principal witness for the libelants and those for the respondent. The story is told for the libelants by one Stevens who was steering the power boat at the time of the collision, while for the respondent a detailed account of the occurrence is given by the pilot of the respondent, the Mundolphin. I had the advantage of seeing and hearing this witness testify in person, and he is corroborated on the most material points in controversy by the captain of the Mundolphin and also to some extent by the captain of a third steamer which a few minutes before had passed both the steamer and the power boat. I did not have the advantage of hearing the witness Stevens in person, his testimony being submitted by deposition. I think the distinct weight of the testimony both in quantity and quality is in favor of the respondent's version of the occurrence. I have, therefore, adopted it in the finding of facts. It is agreed on both sides that prior to the collision a single blast of the whistle was given by the steamer calling for a port to port passing of the two power driven boats. This signal was heard but not answered or in any way acted on by the Velma Brooks, the smaller boat, until almost immediately before the collision when the crash was made inevitable by her helmsman who veered his ship to port when the collision could still have been obviated by bearing to starboard. The crucial point in controversy between Stevens and the pilot of the steamer is as to the time when this port to port signal was given, and as to the position of the two boats at that time. According to Stevens this signal was not given to the steamer until the boats were practically already in collision. But according to the pilot, confirmed by the captain of the Mundolphin, the signal was given at 10:07 o'clock, four minutes before the actual collision at 10:11, and when the two boats were at least half a mile apart.

The Brooks was coming down the bay and the Mundolphin going up. Shortly before 10 a. m. a British oil tanker had passed the latter and was about a mile north of her at that hour. Both vessels were holding the usual north by west course up the bay at that

point. The Brooks passed the oil tanker well to the starboard or east heading south or south ½ east, and crossing the stern of the tanker between the latter and the Mundolphin, then nearly a mile to the south. At 10:03 the Brooks was slightly off the port bow of the Mundolphin. A port to port passing of the Brooks and Mundolphin was then quite apparent. But at 10:07 the Brooks shifted her course somewhat to the eastward, so that the vessels then were approaching each other nearly end on, and, in accordance with the applicable rule of navigation for inland waters, the pilot of the Mundolphin at once blew one blast of his whistle for a port to port passing, and immediately shifted her course a half point to starboard, the usual maneuver. He, of course, expected the Brooks to do likewise in accordance with the well-established and long-prevailing rule and custom of navigation, but, as the Brooks made no response and no change in her course, at 10:09 when the vessels were still at least 500 feet apart, he stopped his engines, although still there was no real imminence of collision, as the slightest action in proper steering of the Brooks would have avoided it. Then for the first time the helmsman of the Brooks did take action—the wrong one—by quickly veering to his port instead of starboard (due to his excitement, as he said) which was the immediate cause of the collision, although the pilot for the Mundolphin did his best to avert it by reversing his engines full speed astern, at 10:10, the actual collision ensuing at 10:11. The accident was not unavoidable, but could and would have been avoided if the steersman of the Brooks had paid the proper and required attention to the port to port passing signal (which he heard) when given, or at any time within two or three minutes thereafter, and could have been easily avoided even if at 10:10 he had veered to starboard instead of port, as he admitted his boat "was quick at the helm," and said, "I could have cleared him in the length of the boat away. If he had blew me a blast seventy-five feet away I could have cleared him."

The fault of the Brooks is undeniable and was seemingly so flagrant that it is hard to understand until we know the conditions prevailing on her. They appear from the libelant's own testimony. In the first place, she was undermanned. The certificate of inspection required her to carry one licensed master, one licensed engineer and one deck hand when under way. On the day of the collision her crew consisted of a licensed master,

one deck hand and one cabin boy. Despite this deficiency in her crew no doubt she could have been properly navigated if the crew had been properly disposed and attentive to their duties prior to the collision; but at that time the master was asleep, the cabin boy was in the cabin, but not used as a lookout as could have been done, and the navigation was entirely in charge of the deck hand who was acting as helmsman. From his own testimony it is clearly apparent that he was inexperienced and at least not skillful and even more importantly, he was greatly handicapped by the presence of the large sail which entirely obstructed his vision of the sea on the whole of the starboard side of his boat, except when he would practically leave the wheel and peep under the sail. Although he said that he had been aware of the presence of the two steamers for some time before he passed the first, and thereafter once or twice looked under the sail to locate the Mundolphin, a reading of his deposition in the light of the whole testimony leaves the impression that he did not pay attention to the relative locations of his boat and of the Mundolphin for a considerable time prior to his last sudden desperate effort to avoid the collision, when he made the fatal mistake, in his excitement, of veering to the left instead of to the right. He said that when the captain gave him the wheel the two steamers were pointed out to him well on his starboard and he was told to continue to sail on a course parallel to them but passing them a half mile or more starboard to starboard, and he contends that he did maintain substantially the same course, although he admits that at one time he did change the course slightly to the eastward in order to give even more passing distance. It is obvious that if he had in fact maintained this parallel course to the eastward of the two vessels, he would not have crossed the stern of the oil tanker and could not have come into collision with the Mundolphin unless she had deliberately changed her course for no reason whatever. The captain of the oil tanker testified that he observed the Brooks in passing and she was headed on a course which would take her across the stern of the tanker and between it and the Mundolphin and that as he observed her she was "yawing" about on her course.

We have then a situation in which a power boat making eight miles an hour is navigated by an inexperienced helmsman whose vision of half his course is blocked by a large sail; and with knowledge that a large steam-

er is within his vicinity he continues on his course in the general direction of the other boat without maintaining an adequate lookout and without the assistance of the cabin boy who was otherwise occupied, although he might easily have been used as a lookout, at least until the other steamer had been passed. This was certainly not careful or prudent navigation. Whether the man at the wheel could have stopped the engines without leaving the wheel and going below does not affirmatively appear, but it does appear that in fact the engines of the power boat were not stopped nor was her speed in any way checked until after the collision. In addition to all this, I have been forced to the conclusion from the testimony that the one-whistle blast from the steamer was given when the vessels were at least half a mile apart and at the time that Stevens made, as he admitted, a change in his course. He further admits that he heard this signal when given. His explanation of his apparent failure to respond to it or to thereafter otherwise act on it, was that the signal was not given until the boats were very close together when, in his excitement, he veered the power boat the wrong way. Of course if I could accept his testimony on this latter point a substantially different factual situation would exist.

■■■ The libelants however insist that, conceding the negligence of the Brooks, nevertheless the Mundolphin was also at fault and, therefore, the damages should be divided. And it is said the Mundolphin could have avoided the collision if one of several things had been done by her pilot instead of what he in fact did do. But the important question is not whether the collision would have been avoided if the Mundolphin had done something else but whether what she did do at the times and under the circumstances, was reasonable and prudent navigation. It is suggested that if when she gave the signal for port to port passing and turned her helm half a point to starboard, she could have changed her course very much more to starboard and thus would have avoided the accident. But the answer to this suggestion is that when the signal was given the boats were at least half a mile apart, there was then not the slightest imminence of a collision and she did change her course in the usual and customary manner and to a reasonable extent. Again it is suggested that when the Brooks did not affirmatively respond for a port to port passing but continued on her course toward the Mundolphin, the pilot of the latter should have stopped his engines sooner than he did. The sig-

nal was given at 10:07 when the boats were half a mile apart and the engines were stopped at 10:09 when the boats were still at least 500 feet apart. Even then the collision could readily have been avoided by proper steering of the Brooks. Consideration must fairly be given to the relative size of the two boats and their respective capacities for equal maneuvers. The Brooks was only 75 feet long and 19 feet beam, with 5-foot depth of hold. She quickly answered her helm and could have cleared the Mundolphin as Stevens testified, in the distance of his boat length or 75 feet, and as the pilot testified, he knew that boats of this type often "come very close to us and then port and go on away from us." Naturally and reasonably he anticipated that the Brooks would do so, there being nothing to indicate to him that she was in any way disabled. But when she veered to port instead of to starboard he saw that the collision was probably inevitable and at once reversed his engine. Until this final fatal error on the part of the Brooks the danger was not obvious or imminent.

■■■ Again it is suggested the Mundolphin might have avoided the collision by suddenly swinging to her port. But this would have been in violation of the passing signal which she had given. And finally, it is suggested that the Mundolphin should have given the danger signal of four blasts prior to the collision. Assuming that it might have been better for the pilot to have given the signal of four blasts when he stopped his engines, it is by no means clear that his failure to do so contributed to the actual collision because Stevens testified that he could not, and apparently would not, have done anything different if he had heard them. It is, I think, quite possible that if the four blasts had been given before 10:09, Stevens might have been awakened from his apparent lethargy, but prior to that time there was no apparent danger. Still again, it is suggested that at 10:09 or 10:10, the course of the Mundolphin could have been altered sharply to the starboard instead of merely stopping the engines and later reversing them. But the pilot explained that this would have been a dangerous maneuver at that time because if, at 10:09, the Brooks had steered to starboard as she obviously should have done, the swing of the stem of the much larger Mundolphin might thus have caused an even worse collision, and also the effect of reversing the engines on the Mundolphin was to slightly carry her bow to starboard, which had the tendency of avoiding the collision even at the last moment, the

actual collision being between the bow of the Mundolphin and the starboard side of the Brooks, about 20 feet from her bow.

 The ultimate reliance of the libelants is placed on the principle that when two boats are approaching each other, each is charged with the active affirmative duty of exercising all possible care to avoid a collision, and the failure of one to do so does not excuse the failure of the other. And, as is said in some of the cases, the failure of one to take the necessary affirmative action cannot be excused on the ground its navigator expected the other to do something to avoid the collision. This principle is probably best expressed in the leading case of The America, 92 U. S. 432, 433, 23 L. Ed. 724, as follows: "Imperative obligation is imposed upon each to comply with the rule of navigation; nor will the neglect of one excuse the other in a case where each might have prevented the disaster, as the law requires both to adopt every necessary precaution, if practicable, to prevent the collision, and will not tolerate any attempt of either, in such an emergency, to apportion the required precaution to avoid the impending danger, in case where both or either might secure perfect safety to both ships and all intrusted with their control and management."

Numerous cases are cited by the libelants' proctor to illustrate the principle. I have examined the cases but find that they deal with situations materially different from those that existed here. In many of them the collision occurred in narrow channels or where seaway was otherwise restricted and both boats were held in fault for lack of prudent navigation after danger became apparent. The principle is sought to be made applicable to the facts of this case by a reference to the testimony of the pilot that he was expecting at any moment before 10:09 (when he stopped his engine) that the Brooks would port her helm and steer to starboard, and it is urged that the pilot had no right to assume that this would be done, but that on the contrary he was under the positive obligation of taking such steps as would avoid the collision, assuming that the Brooks did nothing whatever to comply with the rule of navigation. But I do not understand the principle to be properly so applicable at least under the circumstances of this case. Indeed the contrary seems to be indicated in the following cases. The Acilia, 120 F. 455 (C. C. A. 4); The Gerry, 161 F. 413 (D. C. Md.). See also 11 C. J. 1046, § 38. In my opinion it was entirely reasonable for the pilot of the Mundolphin up to 10:09 to assume that the Brooks would comply with the rule by steering to starboard and when the Brooks still failed to do so, we find that the Mundolphin first stopped her engine and then in a minute reversed full speed astern. And this is not a case in which the Mundolphin did substantially nothing to avoid the collision relying on the other boat to take action. On the contrary, we find that the Mundolphin strictly complied with the rule by first giving the signal for a port to port passing in ample time, and simultaneously changed her course to starboard; and thereafter, when for the first time her pilot became apprehensive that the Brooks would fail to comply with the rule, he stopped his engine and then reversed. He was meeting the situation step by step as it progressively developed. It may be argued that it would have been wiser for him at 10:09 not only to have stopped his engine but at once to have reversed, but at that time the boats were still 500 feet apart and the collision was not imminent or inevitable. A minute later when the Brooks veered the wrong way the pilot adopted the course which his best judgment dictated in the emergency, the reversal of his engine. While it might have been better judgment to have reversed the engine at 10:09 instead of at 10:10, I think this was at most only an error of judgment in a situation brought about wholly by the fault of the Brooks, not amounting to fault or negligence on the part of the pilot of the Mundolphin.

 At least the fault of the pilot, if it was such, is not established by such clear and convincing testimony as is required in a case of this kind where the fault of the other boat is obvious and inexcusable. As was said in The City of New York, 147 U. S. 72, at page 85, 13 S. Ct. 211, 216, 37 L. Ed. 84: "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor." See also to the same effect, the Umbria, 166 U. S. 404, 409, 17 S. Ct. 610, 41 L. Ed. 1053; The Victory, 168 U. S. 410, 423, 18 S. Ct. 149, 42 L. Ed. 519; The Ludvig Holberg, 157 U. S. 60, 71, 15 S. Ct. 477, 39 L. Ed. 620. In The Ambridge (The Willsolo) 42 F.(2d) 971, 976 (C. C. A. 4), it was said by

Judge Coleman: "Where, as here, the fault of one vessel is clearly established, the evidence of the other vessel's fault must also be clear and convincing in order to make out a case for apportionment of damage. This principle has been repeatedly announced by the Supreme Court." See also The Bright (The Cherokee), 45 F.(2d) 150 (C. C. A. 2); The Aeolus (The J. P. McAllister), 58 F.(2d) 984, 987 (C. C. A. 2).

I have, therefore, reached the conclusion that the fault of the Brooks was solely responsible for the collision in this case. It results that the libels must be dismissed, with costs payable by the libelants.