## THE VICTOR.

### No. 448.

District Court, E. D. Louisiana.

Feb. 9, 1945.

Richard A. Dowling, of New Orleans, La., for libelant.

John D., M. A. & Edwin H. Grace, of New Orleans, La., for claimant.

BORAH, District Judge.

This is a libel by the owners of the lugger Timberline against the tug Victor for a collision which occurred on March 13, 1940, and resulted in the sinking of the Timberline.

On the afternoon of the day in question the tug Victor with two steel barges in tow was proceeding along the center line of the Intracoastal Canal near the point where a pontoon bridge crosses the canal at Larose, Louisiana. On reaching a point in close proximity to the half-mile sign the mate observed the Timberline which was then moored alongside the bank on the left or east side of the canal about midway between the half-mile sign and the bridge, and because of this circumstance he ordered a deck hand to go aft on the barges. As a further precautionary measure the tug was slowed to about one mile per hour when it came abreast of the half-mile sign. At this time the wind was blowing diagonally across the canal from the northwest with the resultant effect that when the tug slowed down and lost headway, the wind caused the barges in tow to fall down on the left and drag along the east bank of the canal.

The mate, who was then at the wheel of the Victor, did not regard the situation as hazardous and he concluded in the light of his own experiences and from his knowledge of what was common practice amongst tugboatmen that he could with safety drag the barges past the Timberline and through the bridge. However, instead of rubbing lightly alongside the Timberline, the last barge in the tow struck the bank some distance behind the Timberline, rebounded from the impact and then came back with the wind and struck or slapped the starboard side of the lugger with force, causing said vessel to sink.

When the collision occurred the Timberline was unattended. Cheramie, the operator, had tied the lugger up in front of his house so as to enable him to pick up workmen going on duty on a drainage construction job that was being carried on by libelant and he came upon the scene just in time to witness the collision. Cheramie was frank to admit that the Timberline was moored in an unsafe place; that he frequently tied up there at intervals from ten minutes to two hours and that his reason for so doing was because it was about the best place for him to pick up the operators of the drag-line and the fuel and whatever else was needed on the job.

On the day in question there were a number of steel oil barges moored directly opposite the Timberline on the other side of the canal, and the distance between the Timberline and these barges was about 125 feet. Captain Jeanfreau of the United States Engineers testified that the owner of the Timberline had been warned to move his boat because two mooring permits had been issued to oil companies for loading docks directly across the canal from where he had his boat tied to the bank and it is against the policy of the War Department to issue permits for the mooring of boats opposite one another. The owners and Cheramie deny that they received this warning. But whether they did or did not receive this warning is of little or no importance. What is important is the admitted fact that the owners of the Timberline did not have a permit from the War Department to use a portion of the fairway as a mooring place.

Section 7 of the Rivers and Harbors Act of August 8, 1917, 33 U.S.C.A. § 1, reads in part as follows: "That it shall be the duty of the Secretary of War to prescribe such regulations for the use, administration, and navigation of the navigable waters of the United States as in his judgment the public necessity may require for the protection of life and property, or of operations of the United States in channel improvement, covering all matters not specifically delegated by law to some other executive department."

■ In pursuance of the foregoing statute, the Secretary of War on April 4, 1938, approved certain "rules and regulations to govern the use, administration and navigation of all waterways tributary to the Gulf of Mexico (except the Mississippi River and its tributaries) from St. Marks, Florida, to the Rio Grande." These rules and regulations have the force of law. Section 5b of these regulations reads in part as follows:

"b. Stoppage in Waterway—Anchorage or Mooring—No vessels or rafts shall anchor or moor in any of the land cuts or other narrow parts of the waterway, except in case of an emergency. Whenever it becomes necessary for a vessel or raft to stop in any such portions of the waterway, it shall be securely fastened to one bank and as close to the bank as possible. This shall be done only at such a place and under such conditions as will not obstruct or prevent the passage of other vessels or craft. Stoppages shall be only for such periods as may be necessary.

"No vessel or raft will be allowed to use any portion of the fairway as a mooring place except temporarily as authorized above without the written permission from the District Engineer.

"When tied up, all vessels shall be moored by bow and stern lines. Rafts and tows shall be secured at sufficiently close intervals to insure their not being drawn away from the bank by winds, currents or the suction of passing vessels. Tow lines shall be shortened so that the different parts of the tow shall be as close together as possible. In narrow sections, no vessel or raft shall be tied abreast of another.

*       *       *       *       *

"No vessel, even if fastened to the bank as above prescribed, shall be left without a sufficient crew to care for it properly.

"Vessels will not be permitted to load and unload in any land cuts except at a regular established landing or wharf without written permission secured in advance from the District Engineer."

■ From the foregoing it is clear that the Timberline was moored in an unlawful and dangerous position. This being the situation, the rule announced by the Supreme Court in The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148, constitutes the law of the case, and I quote therefrom this applicable and controlling language: "But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."

The only testimony in this record that could in any way tend to show fault on the part of the Victor is contained in the testimony of Cheramie. This witness was asked: "Was it possible for the tug Victor and tow to have proceeded out in the channel and not come in contact with the Timberline?" And he answered in the affirmative but stated no facts upon which he based his conclusion. The most that can be said in the instant case is that the libelant has raised a doubt regarding the management of the tug; and that is not enough. A like situation was presented to the Supreme Court in The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84, and the court in disposing of that issue used this pertinent language: "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor."

Under the rule of The Pennsylvania libelant has the burden of proving that the Timberline's noncompliance with the rules and regulations not only did not contribute but could not have contributed to the collision. Libelant has failed to meet this burden and is subject to the legal consequences of its failure.

Therefore, the libel must be dismissed with costs.