### HARBOR OIL TRANSPORT CO. OF CONNECTICUT v. THE PLATTSBURGH SOCONY.

### SOCONY–VACUUM OIL CO., Inc., v. THE NEW ENGLAND.

### No. 36.

Circuit Court of Appeals, Second Circuit.

Nov. 5, 1945.

CLARK, Circuit Judge, dissenting.

John W. Knox, of New York City, for appellant.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

SWAN, Circuit Judge.

This litigation concerns a collision in the Kill Van Kull at night between the tanker "Plattsburgh Socony" owned by the appellant, and the tanker "New England", owned by the appellee. Cross libels in rem by the respective vessel owners were consolidated for trial, which resulted in interlocutory decrees holding both vessels at fault and awarding half damages to each libellant. The owner of the Plattsburgh Socony has appealed, contending that the collision was shown to have resulted solely from the faults of the New England.

The vessels collided at a point found by the trial judge to be a few hundred feet to the eastward of Buoy 2-B (which lies about three-tenths of a mile east of the Bayonne Bridge) and slightly on the southerly side of mid-channel. The Plattsburgh Socony was proceeding eastward from Bayway to Bayonne with a tide of two to three miles under foot; the New England was bound in the opposite direction between the same ports. When the vessels sighted each other they were in position to pass safely port to port; when they came together the stem of the appellant's tanker hit the starboard side of tank No. 3 of the New England at an angle of about 45 degrees. The New England's faults were obvious and egre-

gious. As the court found, she was on the wrong side of the channel in violation of the Narrow Channel Rule; she directed her course across the bow of an oncoming vessel; and she endeavored to effect a starboard passing instead of a port to port passing as was called for by law and the circumstances of the case. As to the Plattsburgh Socony the court made a finding that her speed "immediately prior to the collision was too rapid for that locality and existing traffic" and concluded that she "was at fault for proceeding at a rapid rate of speed in these narrow waters, congested by other vessels, without a proper lookout and without being aware of the number of vessels navigating therein and their locations."

■ The criticism as to the Plattsburgh Socony's lookout is not sufficient to condemn her. There is no specific finding on the subject. The criticism is probably based on the lookout's testimony that he did not see and report to the master the Republic tug and her tow. The master himself did not see it and offered as an explanation that the tug's lights were probably blotted out by the lights on shore. But even if it was a fault to fail to observe the tow, such fault had nothing whatever to do with the collision, as will appear from the discussion which follows as to congestion of the waters.

■ The court's findings do not, in our opinion, justify the characterization of the waters as congested. The Plattsburgh Socony passed on the northerly side of Shooter's Island, which is west of the Bayonne Bridge. As she was approaching the waters lying east of the bridge she was on the northerly side of the channel heading somewhat toward the Staten Island side. Ahead of her was the steam lighter Betty Lee and a tug, Socony No. 18, with a lighter in tow on her starboard side. Each of these vessels was proceeding easterly faster than the Plattsburgh Socony and was closer to the Staten Island shore than was she. Neither could in any way impede her navigation or that of the New England, had the latter been willing to accept a port to port passage with her. The New England makes no claim that these vessels impeded her navigation even in her attempt to pass to starboard. Proceeding in the opposite direction was the Republic tug No. 5 with a tow of six coal barges arranged two abreast in three tiers on hawsers of 40 fathoms between the tug and the first tier of barges.

This tow was close to its starboard side of the channel and, if observed, would have presented to the Plattsburgh Socony no impediment to a port to port passage with the New England. The latter was proceeding behind the tow and never caught up with its rear barges, which were some 75 or 100 feet to her starboard before she turned her course to cross the Plattsburgh Socony's bow. The only other vessel in this area of the Kills was the ferryboat which plies between Port Richmond and Bayonne. After the New England had cleared the ferry slip on the New Jersey side, the ferryboat left her slip on the Staten Island side; to the westward of her course her master saw the tug No. 18 and astern of the tug the Plattsburgh Socony, which was then about 200 yards east of the Bayonne Bridge. He blew one short blast which was answered by both the tug and the appellant's tanker, and the ferryboat then proceeded. After that he heard a signal of two whistles given by the New England, and then an alarm. He observed the New England headed across the bow of the Plattsburgh Socony and about two minutes later heard the crash of collision. The conclusion that the waters were congested is not supportable on the facts found. The channel at Buoy 2–B is about 600 feet in width and at the point of collision about 900 feet.

■ Hence the issue of fault on the part of the appellant's tanker comes down to the question of her speed. There is no finding as to what her speed was immediately prior to the collision. Her master testified that in still water, partially loaded as she was, she would make about 8½ knots; that he had rounded Shooter's Island at full speed and when he arrived at the Kill Van Kull (by which he meant the neighborhood of the Bayonne Bridge) he was on slow engines. He so continued until he replied to the signal of the ferryboat when he stopped his engines. He continued with engines stopped until, after two one-blast signals to the New England, unanswered by her, he blew an alarm and reversed his engines. He estimates that his vessel was then making about three or four knots an hour and says that she was practically stopped at the moment of collision. He did not change his course at any time after sighting the New England. We must accept, as did the District Court, the testimony of Captain Abbott, master of the ferryboat. He said that the New England was proceeding very slowly (her

own testimony was about a mile and one-half over the ground) and that he could not estimate at what rate of speed the Plattsburgh Socony was proceeding prior to the collision. Shortly after the accident he gave a statement stating that "my first impression was she was going a little too fast. Upon reflection I am still of the opinion that the Plattsburgh Socony was going a little too fast for that locality and taking into consideration the traffic at that point." It was upon this slender thread that the court hung its conclusion that the Plattsburgh Socony was going "at a rapid rate of speed in these narrow waters" (without any finding as to what her speed was) and condemned her to pay one-half the damages for a collision which occurred at night when the New England left her own side of the channel and attempted to cross the bow of the Plattsburgh Socony without obtaining her consent. We cannot say that the New England's inexcusable navigation might not have succeeded in avoiding collision had the oncoming Plattsburgh Socony been proceeding "a little" slower, but we do say that in such a situation the court should invoke the doctrine that when one of two vessels is grossly at fault and the other only doubtfully so, the latter should be exonerated. The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84; The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943; The Victory & The Plymothian, 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519; The J. P. McAllister, 2 Cir., 58 F.2d 984. Upon this principle of law we hold that the decrees should be modified to hold the New England solely responsible. It is so ordered.

CLARK, Circuit Judge (dissenting).

The District Court reached a reasonable and rational conclusion in accordance with the views and testimony of disinterested witnesses, and I think we should follow our professed self-denying ordinance against reversing findings of fact in admiralty and affirm. The issue of fault on the part of appellant's tanker is not barely the question of her speed, but that of her speed in the light of her course. The course she was following was roughly a dog's leg to the left around Bergen Point on the north side of the channel. It would be natural in any event for a navigator to cut across the turn he must make and proceed near the Point; and this tendency would be the stronger in view of the considerable amount of shipping appearing on the Staten Island side of the channel at the time. Actually that was the tanker's course according to the disinterested witnesses, resulting in the finding that as she approached the waters in question she "was on the northerly side of the channel heading somewhat toward the Staten Island side." The opinion accepts this finding, but then—somewhat illogically, it seems to me—refuses to accept the finding that she was going too fast under the circumstances, though she actually managed to get from the northerly side of the channel to the place of collision "slightly on the southerly side of mid-channel," where "the New England very slightly favored the Staten Island shore." Speed is relative; if we concede that the Plattsburgh Socony's initial course was not necessarily negligent, no danger being then apparent, we should agree with the view that she went too fast on a new and confusing course.

This all has a bearing upon the application of the "gross-fault" rule. That rule is not particularly rational itself, but is only a rather cumbersome device for avoiding some of the consequences of a lack in our law of a rule of proportional division of loss according to degree of fault, "now the method of loss distribution employed by every important maritime country in the world except the United States." Gregory, Legislative Loss Distribution in Negligence Actions, 1936, 53; Mole and Wilson, A Study of Comparative Negligence, 17 Corn. L.Q. 333, 346; Robinson on Admiralty, 1939, 852-857. As such a device, it has certain utility; but it should be recognized for what it is, and its lifting-by-one's-bootstraps qualities duly appraised. Here obviously the fault of the New England appears increasingly less gross, the more the Plattsburgh Socony is found to have approached from the latter's port or "wrong" side of the channel and the nearer the collision occurred towards mid-channel or the northerly side thereof. In view of the other evidence and the natural circumstances of the case, I do not believe we should employ the gross-fault rule to cover up the confusing character of the Plattsburgh Socony's own navigation, particularly against the findings of an experienced admiralty judge.